IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


David H. Haynes,                    :

        Plaintiff,                  :

    v.                             :     Case No. 2:03-cv-1146

City of Circleville, Ohio,          :     MAGISTRATE JUDGE KEMP
et al.,
                                   :
        Defendants.

OPINION AND ORDER

        Plaintiff David H. Haynes brought this action pursuant to 42
U.S.C. §1983, alleging, *inter alia*, that the Defendants City of
Circleville ("City") and the City's Chief of Police, Harold Gray,
Jr., wrongfully terminated Mr. Haynes' employment in violation of
his First Amendment right to free speech.  Furthermore, Mr.
Haynes alleges that he was wrongfully terminated in violation of
Ohio public policy and Ohio's whistle blower statute.  The
defendants moved for summary judgment.  For the following
reasons, the defendants' motion for summary judgment is granted
to the extent of dismissing Mr. Haynes' claims under Ohio state
law and is denied on all other claims.

                                   I.

        The following facts are taken from the complaint and the
materials submitted by the parties in connection with the summary
judgment motion.  Mr. Haynes was hired as a patrolman for the
City in April 1991.  In 1996, the City created a canine unit
based on input from Mr. Haynes and the former Police Chief, Jon
Kinney.  When the canine unit was created, it complied with
standards outlined in Ohio Administrative Code 109:23-7-03.
Originally, the training schedule for the canine unit consisted

of approximately twenty-eight hours on patrol and at least twelve hours or more of paid training per week.  Mr. Haynes was paid for all of his additional training time, including overtime.

Police Chief Gray was hired in January 1999.  In 2000, Mr. Haynes resigned from the police force and went to Kosovo as part of a United Nations peace-keeping task force.  When Mr. Haynes returned in the Fall of 2001, he was rehired by the City.  The record is unclear as to whether Mr. Haynes was or was not a union member.  Regardless, both parties indicate that he was subject to the restrictions and rights of the collective bargaining agreement and the additional canine addendum contract.

At the time of the re-hiring, Mr. Haynes and Chief Gray had some disagreements about the training hours of the canine unit.  Mr. Haynes wanted to continue to train under the original schedule of twenty-eight hours of patrol and twelve hours of training per week.  In contrast, Chief Gray wanted to cut the training time to be in literal compliance with the collective bargaining agreement, which Mr. Haynes believed was insufficient.  However, Mr. Haynes signed the collective bargaining agreement knowing that the training schedule could be modified in the future.

When Mr. Haynes returned from Kosovo, he spent time training his new canine under the old training schedule.  Soon thereafter, Chief Gray created a new canine training schedule, which consisted of a three-week rotation.  During the first week, one canine team would train at Watchmeister in Dublin, Ohio while the other team would train in Circleville.  The teams would switch locations the following week.  Finally, in the last week of the rotation, the canine and the handler would train together.  According to the record, the total amount of training under the new schedule was 172 hours per year, compared to approximately the 500 hours per year spent training under the old program.

2

Mr. Haynes objected to the new training schedule because, in his opinion, it could affect the dog's performance. Specifically, Mr. Haynes stated that the lack of training could affect recall and lead to false alerts. Moreover, Mr. Haynes indicated to Chief Gray that the lack of training could lead to unnecessary dog bites. Chief Gray disagreed with these assessments because he wanted Mr. Haynes to do more training at home so that the dog would be more readily available. The Chief noted that when the dog is away at training, it was unavailable to use. Therefore, the Chief believed that if training was done in the City or at the officer's home, the dog could be called in when needed.

To express his objection to Chief Gray's new training policy, Mr. Haynes wrote a memorandum to Chief Gray on February 24, 2003. (A full copy of this memorandum is attached to this opinion.) The memorandum begins by reiterating the new training policy, which Mr. Haynes admits is in compliance with the collective bargaining agreement. Next, the memorandum states:

> I will not explain my reasoning or logic for insisting on the "Bronco Era" training regime, that has been done, exhaustively, in mid-2000. I have all the documentation from this period, as I am sure you do, so it does not need going over again. However, I should point out a few new points, which need to be put on the record. First, Marco Van Hoof (K9 Rex's broker) and Jeff Moody [from Watchmeister in Dublin, Ohio] were told to find us a "Real Street Dog" that was at the same time somewhat social-for K9 [sic] demos and the like. They were both under the impression that I would be the handler, a second time handler, and that I would continue with the weekly training, as I had done in the past. Well, that is the dog we received when Rex came on board-after the ill-fated Brisco period [sic]. Now we are about to change boats mid-stream and I expect that there will be serious negative

3

consequences for doing so.  Words like
"deliberate indifference", "negative" and
"failure to train" will someday be brought up
with respect to the Circleville Police
Department's Canine Program.  My response
will be, "I told them so."

I seriously considered handing you my leash
and telling you to find another handler when
I received your memo last Saturday-I do not
accept mediocrity and compromise very well.
Fortunately, Sgt. Chapman wisely suggested
that I calm down and think about what I was
doing-thank you Sgt. Chapman.  I have decided
that rather than giving up a wonderful dog, a
job that I dearly love and have a certain
passion for, that I would document my
"protest" and follow the lawful orders of my
Police Chief.  I will not bring this matter
up again; it has been covered thoroughly.
You know, or should know, that any deviation
from the old training regime will probably
result in an expensive learning experience.
But I will not be paying the bill.  You have
received my last words of caution.  It is all
on you now-I hope nothing bad comes of it.  I
will train K9 Rex in accordance with the new
plan, no overtime on Dublin weeks and no more
than 2 hours on Circleville weeks-172 hours
per year.  It will be interesting.

I guess that I should add a personal note
here.  I am a bit offended, once again, that
neither you or Lt. Gaines had the decency to
ask me for my input on this issue-but then I
should know better, I was fooled once, so it
is my fault for being fooled again.  I mean
really, twice?  I am a bit dense.  I guess
that despite the fact that I trained the dog;
have over 6,000 hours of Canine Training
experience, over 15 years of Law Enforcement
experience does not warrant a consultation.
By the way, have you or Lt. Gaines even read
the Daily Training Records for Canine Rex,
and Canine Brisco?  How about the Case law
book for Canine Unit Administrators that I
gave to Lt. Gaines over a month ago?  I would
venture to say that neither of you have-I

4

might be wrong though.

That is it.  I am done documenting.  I
intended this letter to be persuasive not
disrespectful-but it is absolutely essential
that I "go on the record" one last time in
regards to this matter.  We do have a
wonderful new dog, he's a pure joy to work
with and have at home; his personality is
beyond compare.  It is just too bad that he
will not be able to realize his full
potential as a Police Service Dog-I am
finished doing anything for the Canine Unit
beyond the stated 172 hour per year training
limits.  Effective Tuesday, 25 February 2003
I will implement the new Canine Training
schedule.

Mr. Haynes' Memorandum to Chief Gray, Feb. 24, 2003 at pp. 1-2.

Chief Gray replied by sending a memorandum to Mr. Haynes
four days later.  That memorandum stated, in relevant part:

Before I get into the nuts and bolts of the
response I want you to know that I have the
utmost confidence in your ability as a police
officer and as a canine handler/trainer.
With that said; [sic] I want you to know that
I am fully aware that you "do not accept
mediocrity and compromise very well."  I also
know that any conversation with you
concerning this chance would have been
futile.  You would have vehemently opposed
any change.  In a moment of passion you would
have handed me your leash and told me in no
uncertain terms to find another handler.
Therefore, I think that giving you a memo and
letting you think things over before you
respond was in your best interest as well as
the best interest of the department.

Now, I would like to address some of the
concerns you mentioned in your response.

1. *Mediocrity and Compromise*- There is
nothing mediocre about your ability to train
and handle a canine.  The only way the
training will be compromised is if you fail

5

to do your part in correcting problems.  I
don't worry about that because you believe in
these animals and their role in our
profession.

2.  *Total Training Time*- I know that
traveling to Dublin each week has some
benefit.  There will be training conducted at
Dublin that may be difficult to set up here.
I also know that the maximum training a dog
will receive in any training day in Dublin is
two-hours or less.  The other time at this
facility is for networking, planning and
general observation of other canine handlers
to assist them in handling their dog as they
do for you.

3.  *Specialty/Intensive Training*- This was
not discussed in my memo directly or
indirectly.  This type of training has not
been abolished or ruled out.  If you see a
class that you want to attend that is within
reason we would seriously consider sending
you.  We are not going to spend a lot of time
looking for this specialty training but we
are not opposed to sending you if the
training is relevant to our mission. ***

4.  *Deliberate Indifference, Negligence, and
Failure to Train*- I almost took this as a
threat.  I based this on the "*I told them so*"
comment you used immediately following these
words in your memo.

5.  I also took into consideration the
closing comments where you said, "*I am
finished doing anything for the Canine Unit
beyond the stated 172 hour per year training
limits*."  I am sure these comments are made
out of your desire to do well.  However, it
may appear to some that you intentionally
plan to cause a problem of some sort or that
you will fail to correct problems as they
arise.  Don't think that you are relieved of
the responsibility to take appropriate
action.

Every time the dog gets out of the car he is

6

in training.  The dog does not know the
difference between training and work. ***

The responsibility to document every event
correctly and in detail lies on your
shoulders.  If a problem arises because you
failed to take the necessary action you can
and will be held liable.  If there is a
problem and you fail to document it and bring
it to our attention so we can help you
correct it you are in dereliction of your
duty.  I will not settle for "mediocrity and
compromise."

I have other officers who would love to have
the opportunity to do your job.  If you do
not like the parameters we have in place you
should decide now if you want to continue
being a canine handler.  The dog can still be
trained with another handler.  I understand
training liability and can accept the fact
that you want more training time.  Every
Officer wants more training but we have to be
prudent.  These decisions were made in the
best interest of this agency as a whole.

I will not allow your cavalier attitude to
intimidate me.  I have talked to you in the
past about being a team player and not
separating yourself from the other officers
in this department.  Canine handlers are
Police Officers with dogs.  The dog is a
tool.  We have been through this before.  The
choice is yours.  You can do the job or you
can resign from being a canine handler.  The
call is yours.

Chief Gray's Memorandum to Mr. Haynes, Feb. 27, 2003 at pp. 1-2
(emphasis in original).

    A few days after Chief Gray sent his reply memorandum to Mr.
Haynes, Mr. Haynes was called into work early because a canine
was needed to perform a drug search.  According to the record,
dispatch called Mr. Haynes, and Mr. Haynes refused to respond.
Next, Sergeant Barton called Mr. Haynes to bring the canine to do

the drug search, and Mr. Haynes refused again. The record indicates that Mr. Haynes told the Sergeant, "That's just the way it is." After these events transpired, Mr. Haynes stated that he was taking Paxil at the time and was feeling "groggy" so he refused to respond to the call because he did not want to be on-duty while using that drug.

Because of Mr. Haynes' actions, Chief Gray removed Mr. Haynes from his canine duties and kenneled the dog. That same day, Mr. Haynes filled out a sick form for fifteen-and-a-half hours claiming that he had a headache. The sick time off included seven-and-a-half hours of the remaining shift and the entire shift the next day.

Mr. Haynes called shortly before his shift was allegedly to begin on the following Sunday and stated that he was not scheduled to work that day. Mr. Haynes indicated that he was scheduled to be off that day and the department should have known about it. The record indicates that Chief Gray had no record of Mr. Haynes' alleged scheduled time off. Moreover, Chief Gray stated that the schedule indicated that Mr. Haynes was scheduled to work.

Based on the events that transpired, Chief Gray placed Mr. Haynes on administrative leave with pay and ordered a fitness for duty evaluation due to Mr. Haynes' behavior. Chief Gray stated:

> I thought, based on David's behavior and some of the things that I had seen; the fact that he refused to come to work on the Friday prior to when he was called in; the fact that he was just blatantly telling the sergeant, "That's just the way it is, I'm not coming in;" the fact that I had taken the dog to get his attention and that didn't work, I thought maybe, you know, we needed to look at what was going on with Dave.
>
> I ordered a fitness for duty evaluation for

8

> David due to extreme behavior and the fact
> that he indicated to the lieutenant that he
> was on some type of medication that had to do
> with, I don't know, his thought processes or
> his mind or something.  I don't know exactly
> how to put that into words.
>
> I wanted to make sure Dave was fit for duty.
> I knew he had just come back from a tour
> overseas.  He saw some things over there that
> could be difficult.  I just wanted to make
> sure he was fit for duty.

Dep. of Chief Gray, March 17, 2005 at pp. 53-54.

After being placed on administrative leave, Mr. Haynes went home and packed up all of his gear in a box and wrapped the box in gift wrapping paper with bows and ribbons.  Mr. Haynes addressed the box to the Police Chief with the instructions that the Chief not open the box until Christmas.  Two officers went to Mr. Haynes' house to pick up the package.  Mr. Haynes instructed the officers to deliver the package to Chief Gray.  Additionally, Mr. Haynes contacted the department and informed Sergeant Baer that any future visitors from the department would be treated as trespassers.

Mr. Haynes failed to appear for his scheduled psychological fitness for duty evaluation.  The record indicates that Mr. Haynes acknowledged the appointment, but was waiting to consult with his attorney before attending.  A pre-disciplinary conference was conducted to determine Mr. Haynes' status.  Seven charges were brought against Mr. Haynes.  Mr. Haynes was terminated for insubordination, neglect of duty, disrespect, failure to report, conduct unbecoming of an officer, sick leave violations, and unsatisfactory performance.

Mr. Haynes did not appeal his termination under the procedure outline in the collective bargaining agreement. Instead, he attempted to file a grievance with the Ohio Civil

Service Commission, but failed to obtain a time-stamped copy of his termination notice in order to start the grievance procedure.

On November 7, 2003, Mr. Haynes initiated this action in the Pickaway County Court of Common Pleas. The case was subsequently removed to this Court. The City and Police Chief Gray now move for summary judgment.

                                    II.

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.  It is with these standards in mind that the instant motion must be decided.

In the instant case, Mr. Haynes claims that he was discharged in violation of his First Amendment right to free speech.  Furthermore, Mr. Haynes argues that his termination is in violation of the Ohio whistle blower statute, R.C. §4113.52. Finally, Mr. Haynes suggests that his discharge is in violation of public policy under Ohio common law.  The Court will analyze each of these claims in light of the facts of record, and appropriate inferences, to determine if summary judgment is warranted on any of them.

III.

A plaintiff seeking to establish a case of retaliation for speech that is protected by the First Amendment must point to evidence that satisfies three elements: (1) the plaintiff engaged in constitutionally protected speech; (2) the plaintiff was subjected to adverse action or was deprived of some benefit; and (3) the protected speech was a "substantial" or a "motivating factor" in the adverse action.  Brandenburg v. Housing Authority of Irvine, 253 F.3d 891 (6th Cir. 2001) (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

A.

The issue of whether a plaintiff engaged in constitutionally protected speech is a question of law for the court, Connick v. Myers, 461 U.S. 138, 148 (1983), and the employee bears the burden of proving his or her actions were constitutionally protected in the particular circumstance.  Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999).  The first part of this test requires the Court to determine whether the plaintiff's speech

11

addressed a matter of public concern.  See Pickering v. Board of
Education, 391 U.S. 563, 568 (1968).  Next, the court must decide
whether "the interest of the employee as a citizen, in commenting
on matters of public concern, outweighs the employer's interest
in promoting efficiency of the public service it performs through
its employees."  Perry v. McGinnis, 209 F.3d 597, 604 (6th Cir.
2000).  Only if an employee can satisfy both parts of this test,
indicating that his or her speech was protected, should the Court
determine whether the last two elements of a cause of action for
retaliation, i.e. adverse action and motivation, are present.
Brandenburg, 253 F.3d at 898.

       "Whether an employee's speech addresses a matter of public
concern must be determined by the content, form, and context of a
given statement, as revealed by the whole record."  Connick, 461
U.S. at 147-48.  Speech involves a matter of public concern when
it touches upon "issues about which information is needed or
appropriate to enable the members of society to make informed
decisions about the operation of their government."  Brandenburg,
253 F.3d at 898 (quoting McKinley v. City of Eloy, 705 F.2d 1110,
1114 (9th Cir. 1983)).

       In making determinations about protected speech, however,
matters of public concern must be contrasted with internal
personnel disputes or complaints about an employer's performance.
Id.  In distinguishing between matters of private and public
concern, the focus is not on "what might incidentally be conveyed
by the fact that the employee spoke in a certain way, [but] the
*point* of the speech in question."  Dambrot v. Central Michigan
Univ., 55 F.3d 1177, 1187 (6th Cir. 1995)(quoting Linhart v.
Glatfelter, 771 F.2d 1004, 1010 (7th Cir. 1985))(alteration in
original and internal quotations omitted).  The United States
Supreme Court stated:

              To presume that all matters which transpire

> within a government office are of public
> concern would mean that virtually every
> remark–and certainly every criticism directed
> at a public official–would plant the seed of
> a constitutional case.  While as a matter of
> good judgment, public officials should be
> receptive to constructive criticism offered
> by their employees, the First Amendment does
> not require a public office to be run as a
> roundtable for employee complaints over
> internal office affairs.

Connick, 461 U.S. at 149.

At issue in the instant case is whether the memorandum that
Mr. Haynes sent to Police Chief Gray touches upon matters of
public concern.  The beginning of the memorandum appears to be a
comparison between the new and the old training schedules.  The
memorandum also highlights prior events and reiterates Mr.
Haynes' canine training abilities.  These portions of the
memorandum appear to be nothing but internal disputes or
complaints voiced by Mr. Haynes to the Police Chief.  However,
there are some statements in the memorandum that may touch upon
matters of public concern.  See Connick, 461 U.S. at 149
(determining that because the survey distributed to office
personnel did have one question that touched upon matters of
public concern, the Court must analyze whether the defendant was
justified in discharging plaintiff); Rodgers v. Banks, 344 F.3d
587, 597 (6th Cir. 2003)("However, the employee's entire speech
does not have to focus on matters of public concern, as long as
some portion of the speech does so.").

Primarily, this Court analyzes the following statements in
the memorandum.

> Now we are about to change boats in mid-
> stream and I expect that there will be
> serious negative consequences for doing so.
> Words like "deliberate indifference",
> "negligence" and "failure to train" will
> someday be brought up with respect to the

> Circleville Police Department's Canine
> Program.  My response will be, "I told them
> so."
>
> You know, or should know, that any deviation
> from the old training regime will probably
> result in an expensive learning experience.

Mr. Haynes' Memorandum to Chief Gray, Feb. 24, 2003 at p. 2.

After reviewing the content and form of these statements, while keeping in mind the record as a whole, this Court concludes that these statements touched upon matters of public concern. The record indicates that there was longstanding tension between Chief Gray and Mr. Haynes about the amount of training necessary to effectuate a successful and safe canine training program.  On the one hand, Mr. Haynes believed that the old-style training regimen was necessary to maximize the canine unit's efficiency and minimize any possible mistakes that could include dog bites or false attacks.  On the other hand, Chief Gray believed that the training hours outlined in the collective bargaining agreement that was signed by Mr. Haynes provided sufficient training for the canine and its handler.

Here, the analysis is not on whether the new or the old training schedule is the *best* training schedule for the canine units.  Whether right or wrong in his assessment of the new training program, the statements highlighted, *supra*, indicate that Mr. Haynes believed that the new training program was insufficient to protect the public from adverse consequences engendered by lack of training.  Given Mr. Haynes' training and recognition in the field of canine police work, this Court concludes that Mr. Haynes' statements concerning the new training schedule cannot be characterized merely as an internal personnel dispute or a complaint about Chief Gray's performance.  Rather, issues concerning public safety, which include the possibility of untrained canine units on the streets, as in this context, must

14

be characterized as a matter of public concern.  Ensuring canine
units are trained to control their behavior within the authorized
confines of police work are issues about which discussion is
appropriate to enable members of society to make informed
decisions about the operation of their police department.  In
this instance, the "point" of Mr. Haynes' memorandum was to place
in writing his reasons for opposing the new canine training
program and attempt to remove himself from what he believed to be
a negligent move on behalf of the City to cut training time.

Because there is a portion of Mr. Haynes' memorandum that
can be classified as protected speech, this Court must next
decide whether the interest of the employee as a citizen, in
commenting on matters of public concern, outweighs the employer's
interest in promoting efficiency of the public service it
performs through its employees.  In <u>Meyers v. City of Cincinnati</u>,
934 F.2d 726 (6th Cir. 1991), the Sixth Circuit Court of Appeals
outlined the considerations a court must take into account when
utilizing this balancing test.  The Court stated:

> In order to justify a restriction on speech
> of public concern by a public employee,
> plaintiff's speech must impair discipline by
> superiors, have a detrimental impact on close
> working relationships, undermine a legitimate
> goal or mission of the employer, impede the
> performance of the speaker's duties, or
> impair harmony among co-workers.  The state
> bears the burden of showing a legitimate
> justification for discipline.  As in *Rankin*,
> we look for evidence of the impact of the
> statement on the city's legitimate
> organizational interests.

<u>Id.</u> at 730.

In the case before this Court, it appears that all the
events at issue did not occur immediately after Mr. Haynes sent
his memorandum to the Chief.  In fact, it appears that the
relevant events transpired after Chief Gray responded to Mr.

15

Haynes' memorandum, which could indicate that any potential detrimental impact on the operation of the department may have been the result of the Chief's response rather than Mr. Haynes' memorandum.

After analyzing the <u>Meyers</u> factors with the facts of this case, it appears that the interest of Mr. Haynes as a citizen, in commenting on matters of public concern, outweighs the interest of the Chief and the City in promoting efficiency of the public service it performs through its employees.  First, Mr. Haynes' memorandum was a direct communication solely between Mr. Haynes and the Chief.  While on the surface it may appear that Mr. Haynes' memorandum was an attempt to impair discipline, a total reading of the communication indicates that, despite Mr. Haynes' protest to the new training schedule, he intended on following the Chief's orders.  Second, it appears from the record that over the course of Mr. Haynes' employment, there has been continuous tension between him and the Chief concerning the canine training program.  Thus, a single communication that may continue this tension cannot be classified as the sole reason causing a detrimental impact on the close working relationship of the Chief and Mr. Haynes. Furthermore, the City has not submitted any evidence that Mr. Haynes' memorandum actually caused a detrimental impact.  Third, as discussed, *supra*, while Mr. Haynes' disagreed with the new training schedule, he stated in his memorandum that he intended to follow it, which indicates that he had no intention of undermining the legitimate goal or mission of the Chief's new schedule.  Finally, because of the bilateral nature of the memorandum, it cannot be determined that the memorandum itself impaired harmony among co-workers.

In sum, this Court concludes that there are certain statements in Mr. Haynes' memorandum to Chief Gray that touch upon matters of public concern.  Furthermore, this Court

16

concludes, given the factors outlined in Meyers, that the interest of Mr. Haynes as a citizen, in commenting on matters of public concern, outweighs any interest of the Chief and the City in promoting efficiency of the public service it performs through its employees which might have been impacted by the memorandum itself. In fact, there is no evidence that the mere writing and sending of this memorandum had any adverse effect on the operation of the Circleville Police Department.

Because Mr. Haynes' employment was terminated as a police officer with the City, this Court concludes that there was "adverse action" in this case. Therefore, this Court will proceed directly to the third element of a First Amendment retaliation case, i.e. whether Mr. Haynes' memorandum was a "substantial" or a "motivating factor" in his termination.

B.

In Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 285 (1977), the United States Supreme Court held that even where protected conduct plays a "substantial part" in a decision to terminate an employee, the decision does not "necessarily amount to a constitutional violation justifying remedial action." Specifically, the employee must point to specific, nonconclusory allegations reasonably linking the employee's speech to employer's discipline. Rodges, 344 F.3d at 602. The Court of Appeals for the Sixth Circuit, elaborating on the Supreme Court's holding in Mt. Healthy, stated that if an employee meets the burden of proving a reasonable link between the discipline and the protected conduct, "the employer may 'show[] by a preponderance of the evidence that it would have reached the same decision...even in the absence of the protected conduct.'" Id. at 603 (quoting Mt. Healthy, 429 U.S. at 287). However, the employer's burden involves a question of fact and is ordinarily reserved for the jury to determine in its fact-finding role. Id.

17

at 603.

As indicated earlier, the record reveals an ongoing tension between the Chief and Mr. Haynes regarding the amount of training necessary to effectuate a successful and safe canine program. Moreover, it appears that Mr. Haynes' employment was terminated approximately one month after sending the memorandum in question to Police Chief Gray. A review of the Chief's response to the memorandum indicates that the Chief was not pleased with Mr. Haynes' actions. Given the short period of time between Mr. Haynes' memorandum and his termination, coupled with Chief Gray's response, it is at least reasonable to infer a link between the termination and the memorandum. See Allen v. Michigan Dept. of Corrections, 165 F.3d 405, 413 (6th Cir. 1994) ("evidence...that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation"). Further, the letter outlining the basis for Mr. Haynes' termination makes specific reference to his February 24, 2003 memorandum. Thus, the burden shifts to the City and the Police Chief to prove by a preponderance of the evidence, with the summary judgment standard in mind, that absent the protected speech, Mr. Haynes would have still been terminated.

On March 26, 2003, Mr. Haynes received a letter from the City's Director of Human Resources informing him that he was being terminated. The letter states:

> The purpose of this letter is to notify you
> of the results of your pre-disciplinary
> hearing which was held on Tuesday, March 25,
> 2003. During your hearing, you were informed
> of the charges that were brought against you.
> The pre-disciplinary conference listed the
> following charges:
>
> 1. Insubordination- On January 3 you were
> instructed to train K-9 decoys and to wear
> the same uniform as the other Canine officer,
> Ed Haning when the two of you were working

18

together.  You failed to do this as instructed.  Additionally, on 2/24 you sent a derogatory/threatening letter to the Chief regarding the change of your training schedule; on 3/10 conversation with Lt. Gaines, you stated that the City would be sued and you would testify that our training of the K-9 unit is inadequate even if proper procedures had been followed.  On 3/7 you were contacted by Sgt. Barton who indicated that your assistance was needed in a drug search; however, you refused to come in to assist with the search.  To quote your response: ["]That's just the way it goes.["] You went on to say in your letter: "I am finished doing anything for the Canine Unit beyond the stated 172 hour per year training limits."

2. Neglect of Duty– Your refusal to report to work when called-in as addressed in your K-9 contract clearly demonstrates your Neglect of Duty.

3. Disrespect– On 3/4 you stated to Lt. Gaines that the Police Chief was ["]an idiot[.]["] You also stated to the Lt. that the city owed you $600 dollars and that you wouldn't perform training until you received these monies.  You distributed copies of said letter dated 2/24 to fellow officers.  You also [stated] to your Lt. when you were advised of your administrative leave, you commented that it would be like a paid vacation and that your fitness-for-duty would be determined by kissing our ass.  On 3/10 you sent your remaining equipment, wrapped in Christmas paper with a Daffy Duck tag to read "Do not open until Christmas" to the Chief.

4. Failure to report to duty as required on 3/13 [sic] you failed to report for your psychological evaluation as ordered by the Chief.  Failure to comply is against [the] OPBA contract, General Orders and is insubordination[.] Reference 22.3.1 C. in General Orders.

19

5. Conduct Unbecoming [of] an Officer- On
3/10 contacted Sgt. Baer by phone and
instructed that no persons, friend or other
should come on to your property as they would
be treated as trespassers.  Also instructed
that no phone calls were to be made to your
house.  3/13 you violated the established
Chain of command by contacting members of
City Council before City Administration dealt
with the issue without the permission of the
Chief.

6. Sick Leave Violation- On 3/9 you failed to
follow call-in procedures by telephoning at
1414 hours when the required time is 1400.
You failed to speak to the supervisor on
duty.  Reference General Order Number 111.2.

7. Unsatisfactory Performance- All the above
listed violations contribute to your
unsatisfactory work performance as a sworn
police officer.

Based on the above information that was
discussed with you during your pre-
disciplinary conference that effective
immediately, your employment with the City of
Circleville as a police officer is
terminated.

Letter from Theresa A. Cramer to David Haynes, March 26, 2003,
pp. 1-2.

In Mr. Haynes' memorandum contra to the defendants' motion
for summary judgment, Mr. Haynes responded to these allegations
by referring to his deposition testimony and the affidavit he
filed in this case.  In response to the City's insubordination
allegations, Mr. Haynes argues that he did not feel comfortable
implementing a decoy training program because he was inadequately
trained.  Specifically, Mr. Haynes claims that "[h]e was
concerned with officer safety and liability during training
exercises."  Plaintiff's Memorandum Contra to Summary Judgment at
p. 22.  Mr. Haynes also alleges that his memorandum to the Chief

was not meant in a disrespectful manner.  Furthermore, in regards to any possible future testimony, Mr. Haynes argues that he believed that cutting the canine training hours created an inadequate training environment.  If he is called to testify at trial in regards to any canine mishap, Mr. Haynes claims that he would testify truthfully, and state that, in his opinion, the training was insufficient.

Mr. Haynes also argues that he did not "fail to respond" or report to work.  Mr. Haynes claims that prior to being called into duty on March 7, 2003, he ingested Paxil and felt "groggy." In Mr. Haynes' opinion, "[h]e would not put the public at risk by taking his service revolver and the dog when he was groggy on prescription medicines."  Id. at 23.

Mr. Haynes asserts a similar argument in response to his failure to appear for his fitness-for-duty examination.  The record shows that Mr. Haynes sent a letter to the City indicating that Mr. Haynes was not "refusing" to comply with the order. Rather, Mr. Haynes requested to speak with his attorney prior to attending the psychological evaluation.  With respect to the "conduct unbecoming of an officer" and the "sick leave violations," Mr. Haynes claims he followed procedures within the confines of the law and the collective bargaining agreement.

In response, the defendants highlight evidence suggesting that once Mr. Haynes knew that a doctor would determine his "fitness-for-duty," Mr. Haynes commented to a superior officer, "let's see; if I kiss your ass."  Memorandum from Lt. Gaines to Police Chief Gray, March 11, 2003.  The City and the Chief also claim that Mr. Haynes believed that the administrative leave was nothing more than a vacation.  Id.  Additionally, the defendants argue that the collective bargaining agreement does not provide for the opportunity to reschedule a psychological examination in order to speak to an attorney.  The City and the Chief claim that

21

under the collective bargaining agreement, failure to show for a scheduled fitness for duty examination is, in and of itself, grounds for termination.

In regards to the "Christmas Paper" incident, Mr. Haynes claims that his actions were protected symbolic speech. Specifically, Mr. Haynes argues that, given the events that unfolded prior to this incident, "[i]t was clear that he wanted to convey a message to the Chief." Id. at 25. On the other hand, the City suggests that this conduct "caused great fear and concern among the employees of the City of Circleville." Defendants' Motion for Summary Judgment at p. 13. Moreover, the record reveals that other City employees informed the Chief that they would no longer work with Mr. Haynes because he was "crazy." Id. at 14.

The record reveals two distinct factual arguments concerning why Mr. Haynes' employment was terminated. On the one hand, Mr. Haynes claims he was terminated because of his protected speech. On the other hand, the City and the Chief claim that Mr. Haynes was terminated for the seven reasons outlined in Mr. Haynes' termination letter.

Viewing the evidence in a light most favorable to Mr. Haynes, Mr. Haynes may have reasonable explanations for each of the seven allegations raised in his termination letter. Accordingly, this Court concludes that there are genuine issues of material fact relating to whether, absent Mr. Haynes' protected conduct, which is referred to in the termination letter, Mr. Haynes would have still been terminated. After reviewing all of the pleadings and depositions, therefore, the evidence is such that a reasonable jury could return a verdict for Mr. Haynes on this issue.

In sum, this Court concludes that certain portions of Mr. Haynes' memorandum to the Chief are protected speech.

Furthermore, this Court concludes that there was "adverse action" because Mr. Haynes' employment was terminated. Next, this Court concludes that Mr. Haynes has highlighted specific, nonconclusory allegations reasonably linking his speech to the City's decision to terminate him. Thus, the defendants' motion for summary judgment for the First Amendment claim is denied because genuine issues of material fact exists regarding whether the City would have reached the same decision to terminate Mr. Haynes even in the absence of the protected conduct.

C.

In moving for summary judgment, Chief Gray argues that he is entitled to qualified immunity on Mr. Haynes' First Amendment claim. The Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Such immunity, of course, applies only to Mr. Haynes' damages claim against Chief Gray, and not to any claim for declaratory or injunctive relief. Spruyette v. Walters, 753 F.2d 498 (6th Cir. 1985).

The first step in a qualified immunity analysis is to determine whether the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194 (2001). If a constitutional violation is found, the Court must then decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated a right. Id. A government official will be entitled to immunity as long as the conduct does not violate a clearly established constitutional right of which a reasonable person would have known. Harlow, 457 U.S. at 818. The Court of Appeals for the Sixth Circuit has noted that a right is not considered clearly established unless

23

it has been authoritatively decided by the United States Supreme
Court, the Court of Appeals, or the highest court of the state in
which the alleged constitutional violation occurred. Durham v.
Nu'man, 97 F.3d 862, 866 (6th Cir. 1996). "This is not to say
that an official action is protected by qualified immunity unless
the very action in question has previously been held unlawful,
but it is to say that in the light of pre-existing law the
unlawfulness must be apparent." Risbridger v. Connelly, 275 F.3d
565, 569 (6th Cir. 2002). A single, idiosyncratic decision from
one Court of Appeals is not sufficient to establish a clear
constitutional right. Davis v. Holly, 835 F.3d 1175 (6th Cir.
1987). Thus, claims of immunity must be analyzed "on a fact-
specific, case-by-case basis to determine whether a reasonable
official in the defendant[']s position could have believed that
his conduct was lawful...." Cope v. Heltsley, 128 F.3d 452, 459
(6th Cir. 1997).

In Meyers, the plaintiff was ordered to investigate
complaints that "literature" was distributed to potential
minority and female recruits during a sign-up for a new fire
department recruit class. The "literature" turned out to be a
business card from PREP, Inc., a federally funded business that
assisted minorities in competing for jobs. The plaintiff spoke
to PREP representatives and opined that it was improper for PREP
to help people pass the civil service examination when they could
not then do a good job. The PREP representatives took offense to
the plaintiff's statement and the plaintiff was investigated.

During the course of the investigation, the Fire Chief
concluded that the plaintiff's statements were "objectionable"
and that "no one really did anything wrong, i.e. violated the
law, violated City policy, violated Fire Division Rules or
violated anyone's constitutional rights." Meyers, 934 F.3d at
727 (quotations in original). Upon consideration of the Fire

24

Chief's findings, the City Council ordered the plaintiff to be
demoted, and the plaintiff sued.

The Court of Appeals for the Sixth Circuit concluded that
the plaintiff's statements touched upon matters of public
concern.  Further, the Court held there was no evidence of any
city interest that outweighed the plaintiff's right to speak.
The Court stated:

> In the instant case, plaintiff's speech is on
> a matter of public concern.  The record
> discloses no prior internal office
> disagreements between plaintiff and his
> superiors.  City Manager Johnson's statements
> concerning city policy regarding affirmative
> action make clear that he believed the
> subject to be a matter of general public
> concern.  The city's suggestion that the
> statement is not protected because it was
> couched as opinion over the telephone rather
> than in a public forum was rejected in
> *Rankin*.**** Just as an opinion concerning the
> general policy of affirmative action would be
> a matter of public concern, so too is speech
> concerning methods of implementing
> affirmative action.  Under the facts of this
> case, speech about a politically charged
> issue like affirmative action- whether pro or
> con- should be considered a matter of public
> concern.

Id. at 729-30.

Here, unlike Meyers, there is evidence of a history of
disagreement between Mr. Haynes and the Chief concerning the
requisite amount of canine training time necessary to effectuate
a successful canine unit.  Nevertheless, the factual
circumstances in this case appear to be analogous to the facts
in Meyers because both cases concern retaliation resulting from
private comments regarding matters of public concern.  More
specifically, both cases involve retaliation motivated by
"objectionable" comments about employment policies.  In Meyers,

it was the effectiveness of affirmative action in hiring new fire department personnel; in this case, it is about the effectiveness of a new canine training program. Finally, like the city manager's statements in <u>Meyers</u>, Chief Gray believed that Mr. Haynes' statements about false alerts and dog bites touched upon matters of public safety and concern.

This Court has concluded that, construing the facts in Mr. Haynes' favor, portions of Mr. Haynes' memorandum are protected by the First Amendment and terminating Mr. Haynes for expressing his protected First Amendment rights is violative of the Constitution. Given the extensive jurisprudence in this area, which includes <u>Meyers</u>, and the particular circumstances surrounding this case, the Court concludes that a reasonable official would have recognized both that Mr. Haynes engaged in protected speech and that departmental concerns did not justify retaliatory action based on that speech, either standing alone or as a substantial factor in the adverse job action.

It is always difficult to discern what a reasonable official would have appreciated about the constitutionality of his or her actions when a balancing of factors is required to establish a constitutional violation in the first instance. <u>See</u>, <u>e.g.</u>, <u>Evans-Marshall v. Board of Education</u>, 428 F.3d 223, 234-35 (6th Cir. 2005)("The case-by-case, incremental decisionmaking of balancing test, it is true, infrequently will provide the 'fair notice' that qualified-immunity precedent requires, as each case may contain unique employee interests in speaking and unique employer concerns in restricting the speech.") (Sutton, J. concurring); <u>id.</u> at 239 ("A number of circuit courts of appeal have explained that constitutional rights which require a particularized balancing test, such as the *Pickering* balancing test in this case, will rarely be 'clearly established' for qualified immunity purposes.")(citations omitted)(Zatkoff, J.

concurring, in part, and dissenting, in part). Nevertheless, even in this area, the Court must find the dividing line between speech which clearly enjoys constitutional protection and speech which does not. Otherwise, qualified immunity would always be a successful defense in such cases. Here, the Court finds not only that reasonable public officials would have appreciated in 2003 that Mr. Haynes' speech was protected, but that there were no justification for using such speech as a total or partial basis for discharging Mr. Haynes. Cf. Noyola v. Texas Dept. of Human Resources, 846 F.2d 10021 (5th Cir. 1988). Accordingly, the Court concludes that the Chief is not entitled to the defense of qualified immunity.

IV.

Mr. Haynes also claims that his termination is in violation of the Ohio whistle blower statute, R.C. §4113.52, and Ohio public policy. In response, the City and the Chief contend that both of those allegations are not supported by the record. Moreover, Chief Gray and the City argue that they are immune from those claims under sovereign immunity.

A.

The Ohio whistle blower statute, R.C. §4113.52, states, in relevant part:

> (A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor...and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the

27

violation.***

***

(B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1)....

***

(D) If an employer takes any disciplinary or retaliatory action against an employee as a result of the employee's having filed a report under division (A) of this section, the employee may bring a civil action for appropriate injunctive relief or for the remedies set forth in division (E) of this section, or both, within one hundred eighty days after the date the disciplinary or retaliatory action was taken....

R.C. §§4113.52(A)(1)(a), (B), and (D). Ohio courts have consistently held that a plaintiff may bring a public policy tort claim against an employer, in addition to a whistle blower claim, as long as the plaintiff can identify a source of public policy separate from the public policy embodied in R.C. §4113.52. See, e.g. McNett v. Hardin County Fed. Credit Union, No. 01-04-46, 2004 WL 2940872 (Ohio App. 3rd Dist. Dec. 20, 2004); Iberis v. Mahoning Valley Sanitary District, No. 2000-T-0036, 2001 WL 1647184 (Ohio App. 11th Dist. Dec. 21, 2001); Hale v. Volunteers of America, 158 Ohio App.3d 415 (1st Dist. 2004).

In the case before this Court, the City and the Chief argue that Mr. Haynes was outside the 180-day window to file a whistle blower claim as required by R.C. §4113.52(D). Specifically, the defendants contend that Mr. Haynes was terminated on March 26, 2003, so that the applicable time period expired on September 26, 2003. Because Mr. Haynes did not file this case until November 7, 2003, the defendants contend that Mr. Haynes is time-barred

28

from raising this claim.

While the Supreme Court of Ohio opined that plaintiffs must strictly comply with the language of R.C. §4113.52, <u>Contreras v. Ferro Corp.</u>, 73 Ohio St.3d 244 (1995)(holding that the specific requirements of R.C. §4113.52(A)(1)(a) must be complied with), it is unclear whether the 180-day statute of limitations period falls within that requirement. <u>See, e.g. Hady v. Hunt-Wesson, Inc.</u>, 63 F.Supp.2d 830, 833 (N.D. Ohio 1999)("Neither *Contreras* nor *Kulch* directly address the issue of whether the limitations period of §4113.52 is in fact one of the requirements with which a plaintiff must strictly comply...."). Ohio appellate courts, however, have dismissed actions brought under the whistle blower statute for failing to file a claim within the specified statute of limitations window. <u>See, e.g. Davidson v. BP America, Inc.</u>, 125 Ohio App.3d 643, 655 (8th Dist. 1997)("The civil action was commenced outside the statutory limit of one hundred and eighty days and, consequently, the whistleblower claims must fail in their entirety as a matter of law.").

This Court does not need to address whether Mr. Haynes is time barred from filing a claim in violation of R.C. §4113.52 because it appears that Mr. Haynes' claim fails to comply with the language of the statute. The plain language of R.C. §4113.52(A)(1)(a) indicates that, in order to bring a successful whistle blower claim, an employee must be aware of a violation of any state or federal statute or any ordinance or regulation of a political subdivision. The strict requirements include informing the employer orally and in writing of the alleged violations of federal or state law. <u>Id.</u> at 248; R.C. §4113.52(A)(1)(a).

In the instant case, Mr. Haynes claims in his memorandum contra to defendant's motion for summary judgment that the City and the Chief violated R.C. §§2921.45 (civil rights violation), 2921.44 (dereliction of duty), 2921.03 (witness intimidation),

29

2921.05 (retaliation), 2921.11 (perjury), and 18 U.S.C. §1622 (subordination of perjury).  It appears that this is the first time that Mr. Haynes claims violations of federal and state law.

The memorandum that Mr. Haynes sent to Chief Gray concerning the new canine training program is central to his whistle blower claim.  Nowhere in the memorandum does Mr. Haynes discuss or allege civil rights violations, dereliction of duty, witness intimidation, or perjury as required by the statute.  Mr. Haynes' "new-founded" claims, as asserted in his memorandum contra to defendant's motion for summary judgment, have no statutory foundation.  Under Mr. Haynes' whistle blower claim, the sole focus in this case is whether Mr. Haynes, through his employment with the City, became aware that the new canine training program violated state or federal statute.

A review of the record indicates that, although Mr. Haynes did not agree with the new training policy, he did not believe that the new program violated any state or federal law.  The record states:

> Q.  And my question is, as you sit here today, do you continued [sic] that the training program of the City of Circleville violated some state or federal statute?
>
> A. Yes, I do.
>
> Q. All right.  And now, tell me what it is.
>
> A. They were becoming a hazard to the public.
>
> Q. All right.  And are you aware of any federal statute that regulates canines in the City of Circleville?
>
> A. A federal statute?
>
> Q. Uh-huh.
>
> A. As far as their hours and training and that sort of thing?

Q. As far as their training, yes, sir,
because that's your allegation, the training
is creating this risk, correct?
[Mr. Haynes' attorney:] Objection.

A. That's in my complaint, yes.

Q. Well, is that your allegation, that the
training is creating this risk to the public?

A. That their failure to train or training,
yes, that's definitely part of the risk.

Q. All right.  And are you alleging that it
violates a federal statute?

A. The whistle blower part would be that I
said that and then they fired me for it.  I
think that's the part of the whistle blower
section.

Q. Okay.

A. So I guess that's what I'm saying.

Q. Okay. So if I understand you correctly,
there's no federal statute that you're aware
of that their training program violates?

A. That the training program itself does?

Q. Yes, sir.

A. I don't know.

Q. Are you aware of any state statute that
their training program violates?

A. Well, it's – I'm sorry. ***

Q. Well, we've reviewed the Ohio
Administrative Code that sets forth the
requirements for training a police dog in the
State of Ohio.

A. Right.

Q. Did you see anything in there? You're

31

welcome to look at it again.

A. Okay.

Q. It's there in front of you, Exhibit 1. Anything about their training program that violated state requirements for training a police dog?

A. With respect to their certification, it appears that that's fine.

Q. And we've already agreed that there's no minimum number of hours in the state regulations for training a canine, correct?

A. That's correct.

Dep. of Mr. Haynes, March 18, 2005 at pp. 96-98.

Viewing the facts in a light most favorable to Mr. Haynes, it appears from his own deposition that, while he disagreed with the new canine program, he never became aware or believed that the new training program violated federal or state law. Accordingly, no genuine issues of material fact exist with respect to Mr. Haynes' claim under R.C. §4113.52. Thus, the defendants' motion for summary judgment will be granted on this claim.

B.

In order to make a claim of wrongful discharge in violation of public policy, a plaintiff must first allege facts "demonstrating that the employer's act of discharging [the employee] contravened a 'clear public policy.'" Painter v. Graley, 70 Ohio St.3d 377, at paragraph two of the syllabus (Ohio 1994). The Supreme Court of Ohio stated:

> "Clear public policy" sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other

32

> sources, such as the Constitutions of Ohio
> and the United States, administrative rules
> and regulations, and the common law.

Id. at paragraph three of the syllabus.  Second, the plaintiff must show that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy."  Id. at 384, n.8 (quoting Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: where Does Employer Self Interest Lie?*, 58 U.Cin.L.Rev. 397- 398-99 (1989)).  Third, the plaintiff must show that the dismissal was motivated by conduct related to the public policy.  Id.  Finally, the plaintiff must prove that the employer "lacked overriding legitimate business justification for the dismissal."  Id.  The first two prongs of wrongful termination in violation of public policy are questions of law for the Court.  The last two prongs, i.e. causation and overriding justification, are questions of fact for the jury.  Collins v. Rizkana, 73 Ohio St.3d 65, 68 (Ohio 1995).

The reach of the public policy exception to wrongful discharge, however, is limited to employees at-will.  Haynes v. Zoological Society of Cincinnati, 73 Ohio St.3d 254, 258 (Ohio 1995).  Painter does not apply to employees that are subjected to collective bargaining agreements.  Id.  The Ohio Supreme Court stated that "in order for an employee to bring a cause of action pursuant to [Painter]...that employee must have been an employee at will."  Id.  In Haynes, the Supreme Court of Ohio expressly rejected a claim for wrongful termination in violation of public policy brought by an employee subjected to a collective bargaining agreement.

In the instant case, it is unclear whether Mr. Haynes was a member of the union.  Nevertheless, it is clear that Mr. Haynes was subjected to the rights and restrictions of the collective bargaining agreement.  According to Chief Gray's deposition, Mr.

33

Haynes was a union employee and covered by the collective bargaining agreement. The Chief stated:

> Q. This canine is carved out of the system. I can see here it's an individual contract with a non-union employee and it's attached to the union contract for some reason.
>
> \*\*\*
>
> A. My opinion is that David is a member of the union. He was a fair share member. He didn't like the union. He thought the union promoted slough and laziness. That's quote from Dave on more than one occasion.
>
> Q. Fair share. He didn't pay his dues, did he?
>
> A. And he was entitled to the same rights and benefits as every other union members [sic].
>
> Q. He declined to pay his dues?
>
> A. He paid his dues out of his check every two weeks.
>
> \*\*\*
>
> Q. Would you agree that it would appear that David was employed in two capacities, one as a patrolman that puts him under the SOP of the police department, one as a dog handler that puts under contract?
>
> \*\*\*
>
> A. I would say David was a police officer who had a dog as a tool to use that officers didn't have.
>
> Q. All right. Now, was David under the personnel and policies procedure manual that all city employees are under?
>
> A. Yes.
>
> Q. So when you go to impose discipline, he

34

> would have the same rights to prehearing,
> hearing, present a defense?
>
> A. And he was. He was.
>
> Q. And he would be subject to the same rights
> of step discipline that may be set forth in
> that manual?
>
> ***
>
> A. Yes.
>
> Q. That's my question.  Even though he's not
> a union member, since he was a fair share, if
> there's a union bargaining agreement out
> there that talks about discipline and the
> right to fire or not, David was entitled to
> that entire protection?
>
> A. And he had that.

Dep. of Chief Gray, March 17, 2005 at pp. 67-71.  Additionally, it appears from Mr. Haynes' deposition that he believed he was covered by the collective bargaining agreement except for the provisions in the canine addendum contract.  The record states:

> Q. All right.  Do you understand that
> Paragraph 11 indicates that the collective
> bargaining agreement still applies to the
> canine handler except as may be modified by
> this addendum?
>
> A. Yes, that's what I glean from that.
> ***
>
> Q.  Well, we all agree that you're covered by
> the collective bargaining agreement, do we
> not?
>
> A.  Yes, I'm assuming that that regulates the
> department and employee relations.

Dep. of Mr. Haynes, March 18, 2005 at pp. 102, 107.  Moreover, Mr. Haynes also discussed how the City violated specific

provisions of the collective bargaining agreement when the City terminated his employment.

Because Mr. Haynes was under the collective bargaining agreement, he is not an employee at-will. <u>Haynes</u>, 73 Ohio St.3d at 258. Therefore, Mr. Haynes cannot, as a matter of law, assert a <u>Painter</u> claim for wrongful termination in violation of public policy. Accordingly, the defendants' motion for summary judgment is granted to this extent.

In a related argument, the City and the Chief assert state sovereign law immunity under R.C. §2744.02 against all state law claims raised by Mr. Haynes. Because both state law claims have been dismissed, this Court does not need to reach the merits of the defendants' immunity argument.

V.

In conclusion, the defendants' motion for summary judgment (doc. #41) is GRANTED to the extent of dismissing Mr. Haynes' claim for recovery under R.C. §4113.52 and wrongful termination in violation of public policy. The defendants' motion for summary judgment (doc. #41) is DENIED in regards to Mr. Haynes' First Amendment claim because genuine issues of material fact exist regarding whether the City would have reached the same decision to terminate Mr. Haynes even in the absence of the protected conduct. Additionally, given the facts of this case, this Court concludes that Chief Gray is not entitled to qualified immunity.


/s/ Terence P. Kemp
United States Magistrate Judge

# Circleville Police Department
# Memo



**DATE**           Monday, 24 February 2003

**TO**               Chief H.W. Gray

**FROM**           Officer D.H. Haynes

**REFERENCE**    Canine Training Schedule


      I received the Canine Training Schedule Memo dated 22 February 2003 addressed to the Canine Handlers and Supervisors. In this memo you outlined the changes to the existing Canine Training Program/Schedule-now that there are two Certified Patrol Canines working the street. Essentially, I will be attending organized training with my training group, The Central Ohio Police Canine Association, under the direction of Owner/Trainer Jeff Moody of Wachtmeister Canine Training, Ltd., once every three weeks. The organized training in Dublin has a paid time limit of 5-6 hours (as travel time to/from Dublin is about 2 hours, then 30 minutes or so for dinner). On the "off weeks" I am to train two hours during my shift here in Circleville. I could be wrong, but I believe the math works out like this: 52 weeks in a year, divided by 3, equals 17 "Training Days" per year, times 6 hours, equals 102 hours per year of organized training. There are another 35 other "2 hour weeks" in the year, equaling 70 hours of "on the shift training". The total Training Hours for the year, not counting vacations, sick days or other "off" days is 172 hours. This is in contrast to the 500+ hours per year minimum that I used when working K9 Bronco, (8-10 hours per week in Dublin every Tuesday and 1 week/40 hours of "specialty/intensive training").

      It goes without saying that you know my position on Police Canine Training matters, and it has remained unchanged since the inception of the Canine program in 1996. I hold to the 8-10 hours per week of organized training with the Central Ohio Police Canine Association and 1 week of "specialty/intensive training" per year. This was a very sensitive subject a few years ago while I was working K9 Bronco-as I am sure you remember. I had hoped to avoid a rehashing of this matter by reiterating my intentions to continue with the "Bronco Era" training regime prior to signing the OPBA contract addendum on 22 July 2002. (Yes, the contract does say every three weeks minimum-which was to protect everyone from getting into a legalistic/grievance "situation" if there was a week-where the K9 simply could not get away for training. It was not to be the 'standard' but rather a safeguard, in the event of an exceptional circumstance.) I thought that we were on the same page on this matter, when I discussed it with you on 22 July 2002, prior to signing my "K9 contract". We only had a "verbal understanding" so I suppose it is partially my fault for not getting it in writing. Never the less, we have another Certified Police Service Dog now and I am the trainer/handler-so I guess it is a mute point.

      I will not explain my reasoning or logic for insisting on the "Bronco Era" training regime, that has been done, exhaustively, in mid-2000. I have all the documentation from this period, as I am sure you do, so it does not need going over again. However, I should

# Circleville Police Department
## Memo

point out a few new points, which need to be put on the record. First, Marco van Hoof (K9 Rex's broker) and Jeff Moody were told to find us a "Real Street Dog" that was at the same time somewhat social-for K9 demos and the like. They were both under the impression that I would be the handler, a second time handler, and that I would continue with the weekly training, as I had done in the past. Well, that is the dog we received when Rex came on board-after the ill-fated Brisco period. Now we are about to change boats mid-stream and I expect that there will be serious negative consequences for doing so. Words like "deliberate indifference", "negligence" and "failure to train" will someday be brought up with respect to the Circleville Police Department's Canine Program. My response will be, "I told them so."

I seriously considered handing you my leash and telling you to find another handler when I received your memo last Saturday-I do not accept mediocrity and compromise very well. Fortunately, Sgt. Chapman wisely suggested that I calm down and think about what I was doing-thank you Sgt. Chapman. I have decided that rather than give up a wonderful dog, a job that I dearly love and have a certain passion for, that I would document my "protest" and follow the lawful orders of my Police Chief. I will not bring this matter up again; it has been covered thoroughly. You know, or should know, that any deviation from the old training regime will probably result in an expensive learning experience. But I will not be paying the bill. You have received my last words of caution. It is all on you now-I hope nothing bad comes of it. I will train K9 Rex in accordance with this new plan, no overtime on Dublin weeks and no more than 2 hours on Circleville weeks-172 hours per year. It will be interesting.

I guess that I should add a personal note here. I am a bit offended, once again, that neither you or Lt. Gaines had the decency to ask me for my input on this issue-but then I should know better, I was fooled once, so it is my fault for being fooled again. I mean really, twice? I am a bit dense. I guess that despite the fact that I trained the dog; have over 6,000 hours of Canine Training experience, over 15 years of Law Enforcement experience does not warrant a consultation. By the way, have you or Lt. Gaines even read the Daily Training Records for Canine Rex, and Canine Brisco? How about the Case Law book for Canine Unit Administrators that I gave to Lt. Gaines over a month ago? I would venture to say that neither of you have-I might be wrong though.

That is it. I am done documenting. I intended this letter to be persuasive not disrespectful-but it is absolutely essential that I "go on record" one last time in regards to this matter. We do have a wonderful new dog, he is pure joy to work with and have at home; his personality is beyond compare. It is just too bad that he will not be able to realize his full potential as a Police Service Dog-I am finished doing anything for the Canine Unit beyond the stated 172 hour per year training limits. Effective Tuesday, 25 February 2003 I will implement the new Canine Training Schedule.

End of memo.